510 So.2d 857 (1987)
Robert Patrick CRAIG, Appellant,
v.
STATE of Florida, Appellee.
No. 62184.
Supreme Court of Florida.
May 28, 1987.
Rehearings Denied August 31, 1987.
*859 James B. Gibson, Public Defender, Seventh Judicial Circuit, and James R. Wulchak, Chief, Appellate Div., Asst. Public Defender, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and Evelyn D. Golden, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
This proceeding is an appeal from a judgment of conviction of two counts of first-degree murder and two sentences of death. The imposition of the sentences of death gives this Court jurisdiction of the appeal. Art. V, § 3(b)(1), Fla. Const.
As is the standard procedure in first-degree murder trials in Florida, first there was a guilt-or-innocence phase of the trial at which appellant was determined to be guilty of the premeditated murders of John Smith Eubanks and Walton Robert Farmer. The evidence was legally sufficient to support the jury's verdicts of guilt on both counts. The facts as shown by the evidence presented at the trial will be briefly stated below. After the jury returned the verdicts of guilt, the second phase of the trial was held for the purpose of determining the sentences to be imposed upon the defendant for the two murders. See § 921.141, Fla. Stat. (1981). After hearing evidence and argument of counsel at the sentencing phase, the jury recommended a sentence of death for the murder of Walton Farmer and a sentence of life imprisonment for the murder of John Eubanks. The trial judge, of the Circuit Court of the Fifth Judicial Circuit of Florida, in and for Lake County, imposed sentences of death for both capital offenses. We find no basis for reversal of the judgments of conviction and so affirm them. We vacate the sentences of death for reconsideration.

I. FACTS
The evidence at trial established the following facts. John Eubanks employed appellant as manager of a cattle ranch in Lake County. Appellant lived at the ranch in a mobile home provided by Eubanks, the owner. Appellant hired Robert Schmidt as a helper. Schmidt soon learned that appellant was regularly stealing cattle and selling them. Soon Schmidt began regularly helping appellant transport stolen cattle to market and getting a share of the proceeds. Several months after Schmidt was hired at the ranch, appellant discussed with him the possibility of killing Eubanks. According to Schmidt's testimony at trial, appellant wanted to kill Eubanks because he believed that Eubanks' death would enable appellant to obtain control over the assets of the ranch.
There was testimony that Eubanks had been aware of losses of cattle at the ranch and suspected that appellant was responsible. On the morning of July 21, 1981, appellant and Schmidt returned to the ranch after having sold some cattle at a local market. Eubanks was there indicating that he wanted to inspect the premises and count his cattle. Early that afternoon *860 Walton Farmer arrived at the ranch to meet Eubanks. The evidence showed that the purpose of the meeting was to discuss Farmer's being hired to replace appellant as ranch manager.
Schmidt testified at trial that as the four men then proceeded to move about the ranch looking for cattle, appellant told him that Eubanks had figured out that his cattle were being stolen. According to Schmidt's testimony, appellant said that Eubanks and Farmer would have to be killed or else appellant and Schmidt would go to prison. As the four men entered a wooded area looking for signs of cattle, they separated into two pairs, with appellant accompanying Farmer while Schmidt stayed by Eubanks.
Schmidt testified that when he heard gunshots from the area where appellant and Farmer were, he, Schmidt, shot Eubanks twice in the back of the head. Then Schmidt responded to appellant's call for assistance and saw Farmer on the ground covered with blood. Appellant told Schmidt to shoot Farmer as he was not yet dead. Schmidt did as he was told. Appellant and Schmidt then took the victims' cars to nearby towns and left them. That night, they disposed of the bodies in a deep sinkhole, weighting down the bodies with concrete blocks.
In exchange for his agreement to give testimony for the state at appellant's trial, Schmidt was allowed to plead guilty to reduced charges and was sentenced to life imprisonment on each of the two murder counts.

II. PRELIMINARY ISSUE
Appellant contends that we should not proceed to consider his appeal until he has been afforded a new sentencing proceeding. He bases this contention on the lack of a verbatim transcript of the prosecutor's closing argument to the jury at the sentencing phase of the trial.
After the filing of the notice of appeal, the record of the proceedings in the trial court was sent to this Court. Our capital felony sentencing law requires the "certification by the sentencing court of the entire record" to the Supreme Court for purposes of the mandatory appellate review of judgments upon which death sentences are imposed. § 921.141(4), Fla. Stat. (1981). However, counsel for the appellant by a series of motions pointed out that there were omissions from the record on appeal and moved for supplementation of the record pursuant to Florida Rule of Appellate Procedure 9.200(f). We directed that the record be supplemented by the transmittal to this Court of the omitted portions. Only then was it discovered that, through a mistake, omission, or failure by the Official Court Reporter of the Fifth Judicial Circuit, there existed neither a recording nor any shorthand notes of the prosecutor's closing argument to the jury in the sentencing phase of the trial so that a transcript thereof could not be prepared.[1] Due to the impossibility of producing a transcript of the argument, this Court, on motion of the appellant, relinquished jurisdiction to the circuit court for purposes of reconstructing the record of the prosecutor's argument.
The significance of the foregoing events lies in the fact that, under our capital felony sentencing law and principles of due process, the arguments to the jury in a sentencing proceeding, like the evidence presented, must be relevant to the issues involved in the sentencing decision and must not be unduly inflammatory or emotional or improperly prejudicial to the capital offender. In the present case, appellant argues that his rights to a fair sentencing *861 proceeding and a reasoned sentencing judgment were violated by improper inflammatory and prejudicial argument by the prosecutor to the jury and judge. Thus, the lack of a transcript of the argument presents a problem in view of this Court's responsibility to provide appellate review.
Appellant argues that because of the lack of a verbatim transcript of the prosecutor's arguments on the sentencing issue, there can be no meaningful appellate review. Without meaningful appellate review of the sentencing process and the sentencing decision, he argues, the sentences of death cannot stand. Appellate relies on the principle that appellate review is an integral part of the capital sentencing process, crucial to its constitutionality. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Therefore, appellant concludes, he is entitled to a new sentencing trial.
When this Court relinquished jurisdiction for reconstruction of the record as stated above, the trial court proceeded to reconstruct the record pursuant to Florida Rule of Appellate Procedure 9.200(b)(3). That rule provides as follows:
If no report of the proceedings was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including his recollection. The statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days of service. Thereafter, the statement and any objections or proposed amendments shall be submitted to the lower tribunal for settlement and approval. As settled and approved, the statement shall be included by the clerk of the lower tribunal in the record.
We now have before us a reconstructed account of the matter in question "as settled and approved" by the circuit court. The issue is whether this reconstructed version of the prosecutor's argument to the jury at the sentencing phase of the trial is an adequate basis for appellate review of appellant's contentions with regard to that argument.
In Delap v. State, 350 So.2d 462 (Fla. 1977), upon which appellant relies, this Court reversed a first-degree murder conviction and sentence of death due to the lack of a complete record and ordered a new trial. However, that case was substantially different from the present situation. In Delap, no transcripts were made of "the jury charge conferences; charge to the jury in both the trial and penalty phases; voir dire of the jury; and closing arguments of counsel in both the trial and penalty phases" of the proceedings in the trial court. Id. at 463. Furthermore, the trial court specifically and affirmatively found upon inquiry into the matter that it was "impossible to reconstruct said portions of the record by stipulation or otherwise and that there appears to be no means of completing the requested record." Id. The present case involves omission of a much more limited portion of the trial and the trial court found that it was possible to assemble a reasonably accurate reconstruction of what was said. We therefore find that the reconstructed record of the unrecorded argument of the prosecutor is an adequate record upon which to perform the appellate review process.

III. ISSUES ON APPEAL OF CONVICTIONS
Appellant argues that all the physical evidence found at the scene of the sinkhole where the bodies were recovered, including the bodies of the victims themselves and all information about and descriptions of their condition, should have been excluded from evidence. The law enforcement authorities were able to locate and recover the bodies within a fairly short time after appellant's arrest because he told them where the bodies had been put and directed them to the location. Appellant posits several grounds for ruling that his interrogation was illegal and argues that his statement disclosing and actually leading the sheriff to the location was a direct product of the illegal interrogation. He concludes that the physical evidence therefore should have been suppressed.
*862 The grounds of the illegality of the interrogation put forth by the appellant are that it was the product of the unlawful warrantless arrest of appellant by forcible entry at his home on suspicion of cattle theft in violation of the fourth amendment; that it was carried out without a knowing and intelligent waiver of the right to remain silent and by means of actual threats and coercion in violation of the fifth amendment; and that it was continued by the deceptive and unlawful sequestration of appellant, evading the attempts of legal counsel to reach him in violation of the sixth amendment. Appellant's confession and incriminating statements to the authorities were in fact excluded from evidence at the trial on the ground that they were illegally obtained. The state apparently concedes that the interrogation itself was illegal and the suppression order correct.[2] But the trial court held that the bodies themselves and related physical evidence were admissible on the ground that they were independently obtained. Appellant argues that this was error.
A review of the record reveals that the trial judge was in error when he found that the discovery of the bodies by law enforcement authorities was independent, and not a product, of the illegally obtained statements of appellant. Indeed, the police did not know where the bodies were until appellant directed them there and showed them, and this journey to the scene of disposal was an integral part of the continuing interrogation, which the trial court held and the state concedes was illegal for failure to observe constitutional requirements. The foregoing observation does not end the matter, however. For the physical evidence to be admissible it is not necessary that it have been found independently of the confession if there was a reasonable probability that in the normal course of events it would have been found independently.
The argument that the physical evidence in question should have been suppressed relies on the court-made "exclusionary rule," which forbids the use of evidence in court if it is the product or fruit of a search or seizure or interrogation carried out in violation of constitutional rights. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Cruz, 581 F.2d 535 (5th Cir.1978) (en banc). However, the question of whether the evidence in question is in fact the product or fruit of the constitutionally violative conduct depends on whether the connection between the two is a direct connection. If the connection is attenuated rather than direct, the illegality of the conduct does not always mandate application of the exclusionary rule to bar admission of the evidence. Wong Sun v. United States; Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).
One basis for finding that the connection between a constitutional violation and the questioned evidence is severed or attenuated is the fact that the police were able to obtain the same evidence from a separate and independent source not affected by the unlawful police conduct. Closely related to the independent source doctrine is the rule that the exclusionary rule will not be applied where it can be shown that, had the evidence in question not been obtained by the challenged police conduct, it "ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984).
The evidence presented at the suppression hearing in this case was sufficient to establish by a preponderance of the evidence that, if appellant had not led police to the bodies, they would ultimately have been located very soon thereafter by means of ordinary and routine investigative procedures. There was testimony that the surrounding areas of all sinkholes in the region would have been closely examined as *863 a matter of routine. Also, co-defendant Schmidt had given his lawyer a limited authorization to inform the police that the bodies had been disposed of in deep water. This routine examination of sinkholes would have revealed the drag marks, debris, clothing fibers, and other indicators that were present at Wall Sink where the bodies were found. Wall Sink was the largest and deepest sink in the general area. These indicators, the testimony showed, would inevitably have caused police to concentrate their deep-water searching capabilities at Wall Sink. We therefore conclude that the trial court was correct in admitting the bodies and related evidence, on the ground that although they were in fact found by means of appellant's statements, they would have been found independently even without the statements, by means of normal investigative measures that inevitably would have been set in motion as a matter of routine police procedure. United States v. Satterfield, 743 F.2d 827 (11th Cir.1984), cert. denied, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985); United States v. Brookins, 614 F.2d 1037 (5th Cir.1980). The inevitable discovery doctrine is properly applied regardless of whether the ground of suppression of the statement is violation of the fourth amendment, fifth amendment, or sixth amendment. See Nix v. Williams. We therefore find no reversible error in the admission into evidence of the physical items in question, testimony about the location and condition of the bodies of the victims, and related physical evidence.
Next appellant argues that the trial court erred in allowing the state to present evidence of "collateral crimes," that is, testimony and evidence showing that appellant and Schmidt had been stealing cattle from the ranch. Appellant was not charged with any crimes based on this conduct. He argues that therefore the evidence pertaining to the stealing was not relevant to any material issues, served only to prejudice the jury against him, and should have been excluded. This argument ignores the fact that the background information concerning appellant's employment as ranch manager and the continuous pattern of thievery was relevant to establish his motives and to provide the jury with the entire factual context in which the charged crimes arose.
In a criminal trial, it is generally improper to admit evidence tending to show that the accused committed crimes other than those of which he stands accused. This rule is but a specific application of the more general principle that all evidence must be relevant to a material issue. But "collateral crime" evidence is given special treatment because of the danger of prejudicing the jury against the accused either by depicting him as a person of bad character or by influencing the jury to believe that because he committed the other crime or crimes, he probably committed the crime charged. See, e.g., Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959); Winstead v. State, 91 So.2d 809 (Fla. 1956); Nickels v. State, 90 Fla. 659, 106 So. 479 (1925). A verdict of guilt on a criminal charge should be based on evidence pertaining specifically to the crime. The jury's attention should always be focused on guilt or innocence of the crime charged and should not be diverted by information about unrelated matters.
We find that the evidence of appellant's thefts of cattle on several occasions was relevant to show his motive for killing Eubanks and Farmer. Williams v. State. The cattle thefts were not wholly independent of the murders but rather were an integral part of the entire factual context in which the charged crimes took place. Smith v. State, 365 So.2d 704 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979). While evidence of motive is not necessary to a conviction, when it is available and would help the jury to understand the other evidence presented, it should not be kept from them merely because it reveals the commission of crimes not charged. The test for admissibility is not the necessity of evidence, but rather its relevancy. Hall v. State, 403 So.2d 1321 (Fla. 1981); Ruffin v. State, 397 So.2d 277 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). We therefore hold that the evidence about the cattle *864 thefts was relevant and was properly admitted.
Appellant makes the same relevancy argument with regard to some testimony that indicated that he spent some of the money he gained from the unauthorized cattle sales on illicit drugs. Appellant argues that this had the effect of depicting him as a person of bad character. In contrast to our finding regarding the evidence of thievery as discussed above, we do not believe that the testimony about illegal drug use was relevant to any material issue in the case or to reasonably related factual background. Appellant's objection to it should have been sustained. We do not agree, however, that the matter compelled a mistrial or that reversal is required now. The basis for the prohibition on evidence of collateral crimes should be kept in mind:
Evidence that the defendant has committed a similar crime, or one equally heinous, will frequently prompt a more ready belief by the jury that he might have committed the one with which he is charged, thereby predisposing the mind of the juror to believe the prisoner guilty.
Nickels v. State, 90 Fla. at 685, 106 So. at 488 (emphasis supplied). While all irrelevant evidence should be excluded or stricken on motion or objection, we are not persuaded that any prejudice flowed from the evidence of illegal drug use when there was ample direct evidence of appellant's guilt on two counts of first-degree murder. We therefore find that the error was harmless.
Appellant's next argument is that the trial court erred in denying his motion for mistrial made during the prosecutor's closing argument to the jury in the guilt phase of the trial. Appellant presents numerous contentions that various features of the argument were unduly emotional, inflammatory, and prejudicial to his right to a fair trial. While certain of the arguments appellant makes refer to prosecutorial comments to which the defense objected below, with the issues having been preserved for review by motion for mistrial "at some point during closing argument or, at the latest, at the conclusion of the prosecutor's closing argument," State v. Cumbie, 380 So.2d 1031, 1033 (Fla. 1980), most of the challenges now made were not raised by timely objection in the trial court. A motion for mistrial based on certain grounds cannot operate to preserve for appellate review other issues not raised by specific objection at trial. Thus defense counsel's attempt, when he objected on the ground of repeated references to the defendant as having lied in his testimony, to have his motion apply to the whole argument thus preserving for review objections not specifically made to the trial court, must fail with the result that most of the objections argued are being raised for the first time on appeal. Therefore, all but two of appellant's thirteen asserted instances of prosecutorial misconduct are not properly before the court on appeal and will not be considered.
Appellant argues that the prosecutor made improper and erroneous statements about the law of principals as it related to the evidence of the relative culpability of appellant and the accomplice, Schmidt. This and other remarks of the prosecutor concerning the relative roles of the two perpetrators in committing the two murders were in response to defense arguments and suggestions designed to attack the credibility of Schmidt as a witness.
In a criminal trial, whenever the evidence shows that more than one perpetrator participated in a crime, defense counsel can be expected to raise questions about the relative roles and culpability of the other perpetrators and will attack the credibility and motives of any accomplice testifying for the state. Such challenges to the state's evidence are quite proper and that is what happened here. The prosecutor's argument was merely in response to such arguments and suggestions by defense counsel and was equally proper. To the extent that the prosecutor misstated the law, we note that the judge cautioned the jury that the court would instruct them on the law and that they should follow the *865 instructions of the court. This adequately remedied any impropriety.
Appellant argues that the prosecutor improperly made repeated references to defendant's testimony as being untruthful and to the defendant himself as a "liar." It may be true that the prosecutor used language that was somewhat intemperate but we do not believe he exceeded the bounds of proper argument in view of the evidence. When counsel refers to a witness or a defendant as being a "liar," and it is understood from the context that the charge is made with reference to testimony given by the person thus characterized, the prosecutor is merely submitting to the jury a conclusion that he is arguing can be drawn from the evidence. It was for the jury to decide what evidence and testimony was worthy of belief and the prosecutor was merely submitting his view of the evidence to them for consideration. There was no impropriety.
We have reviewed the entire closing argument of the prosecutor at the guilt phase of the trial in light of appellant's other contentions of impropriety and conclude that nothing was said or done that deprived appellant of a fair trial.
Next appellant contends that the trial court erred in instructing the jury on the minimum and maximum penalties prescribed by law for not only the crimes charged but for all lesser included offenses of the crimes charged. We agree that this action of the trial court was error but reject appellant's further contention that the error entitles him to a new trial.
At the time of appellant's trial, Florida Rule of Criminal Procedure 3.390(a) provided as follows:
The presiding judge shall charge the jury only upon the law of the case at the conclusion of argument of counsel and upon request of either the State or the defendant the judge shall include in said charge the maximum and minimum sentences which may be imposed (including probation) for the offense for which the accused is then on trial.
Pursuant to this rule, defense counsel requested that the court instruct the jury on the maximum and minimum sentences that could be imposed for the offenses charged. Appellant was on trial on two counts of first-degree murder. With regard to each of the offenses charged, the possible penalties were limited to either a sentence of death or life imprisonment without eligibility for parole for twenty-five years. §§ 782.04, 921.141, Fla. Stat. (1981). Defense counsel did not ask for instructions on the possible penalties for all the lesser included offenses of first-degree murder, nor did the rule cited or any other rule provide for or authorize such instructions.
Appellant argues that the instructions on minimum and maximum penalties for all lesser included offenses improperly impaired his due process right to have the jury impartially consider returning verdicts of guilt of lesser included offenses on one or both of the counts of the indictment. Appellant points out that the minimum penalties for some of the lesser degrees of homicide appear quite lenient compared with the possible penalties for first-degree murder. He contends that this procedure prejudiced the jury against the possibility of considering a lesser verdict on either of the charges.
While defense counsel only requested penalty instructions on the charged offenses of first-degree murder, the charge conference transcript shows that he did not make the specific objection, stating grounds, and the argument of prejudice that appellant makes now. Because objections to instructions and the legal grounds therefor must be specifically stated before the jury retires in order for the objection to be reviewable on appeal, we find that the trial court's error has not been preserved and is not properly before us. Fla.R. Crim.P. 3.390(d).
Moreover, even if the issue of the erroneous instruction were properly before us on appellate review, we would find the error to be non-reversible on the ground that it was harmless beyond a reasonable doubt. Appellant relies on Murray v. State, 403 So.2d 417 (Fla. 1981), and Tascano v. State, *866 393 So.2d 540 (Fla. 1980), as support for the proposition that rule 3.390 is mandatory and that its violation is presumed harmful. Tascano and Murray are inapposite. They concerned the error committed when courts refused to instruct on possible penalties for the crime charged after being asked to do so by the defendant. No such error occurred here. In view of the overwhelming evidence of guilt of two counts of first-degree murder, we conclude that the instructions on possible penalties for all the lesser degrees of homicide cannot have affected the jury's deliberations or the verdicts.

IV. ISSUES ON APPEAL OF THE SENTENCES OF DEATH
Appellant contends that the prosecutor made improper, inflammatory, and prejudicial remarks to the jury in his argument at the sentencing phase of the trial. Based on the reconstructed record of the prosecutor's closing argument at the sentencing phase, we find that no reversible error occurred. Although, as the trial court found, the remarks were somewhat dramatic in character, they were not inflammatory or inordinately emotional. The argument was no more emotional than is normal in a criminal trial. The facts of the murders themselves had already been determined by the jury as expressed in their verdicts finding appellant guilty of two counts of first-degree murder. A prosecutor is allowed fair comment on the facts shown by the evidence and the facts of this case were such as to justify a somewhat dramatic presentation by the prosecutor on the question of sentencing. We find no reversible error.
Next appellant contends that reversible error occurred at the penalty phase of the trial when a medical examiner characterized one of the killings as having been carried out "execution-style." Appellant contends that this testimony constituted an opinion on a matter not within the medical examiner's area of expertise. Appellant relies on the principle that expert opinion testimony is only proper with regard to matters that are scientific or technical in nature and beyond the common understanding of laypersons. He argues further that the ordinary opinion given by the witness was improperly raised to the level of expert testimony due to the witness's status as a medical expert.
The medical examiner's testimony referring to one of the killings as "executionstyle" was given in connection with his description of the paths of the bullets that caused the death of John Eubanks. The characterization was based on the fact that the paths of the bullets showed that Eubanks was shot twice in the back of the head. The paths of the bullets were proper matters for the medical examiner to testify about. The further characterization of the killing as having been done "executionstyle," while not technically an opinion on a matter beyond the understanding of laypersons, was not such as to prejudice the rights of the defendant. It should be noted that the jury recommended a sentence of life imprisonment for the murder of Eubanks. The jury was probably influenced by the fact that state witness Schmidt was the direct perpetrator of the killing of Eubanks. Therefore appellant was not prejudiced by the examiner's commentary regarding the killing of Eubanks insofar as the jury's sentencing recommendation was concerned. We therefore find no reversible error on this point.
Appellant contends that his sentence of death for the murder of John Eubanks must be vacated because the trial court considered non-record and non-disclosed information and further because such information was considered in aggravation even though it did not relate to any statutory aggravating circumstances. In his findings of fact the trial judge found that the jury recommended a sentence of death for the murder of Walton Farmer by a vote of ten to two and a sentence of life imprisonment for the murder of Eubanks by a vote of seven to five. The judge then made reference to his having given "due regard and consideration to the strength of the recommended sentence of death for the murder of Walton Robert Farmer voted by the trial jury, and to the relative weakness of the vote by the trial jury to recommend *867 a sentence of life for the murder of John Smith Eubanks." Appellant argues that any consideration of the "relative weakness" of the jury's vote to recommend a life sentence is prohibited. He characterizes it as non-record information, that is, information obtained other than through evidence properly presented in court for consideration in sentencing. He asserts that it was not disclosed to him in time to allow for challenge or rebuttal before sentence was imposed. And he argues that any consideration of the matter in question makes it a prohibited non-statutory aggravating circumstance. We conclude that the error, if error there was, is harmless in view of the fact that, viewing the sentencing findings in their totality, we find both sentences of death to be appropriate under the law.
The fact that the jury recommended a sentence of life imprisonment for the murder of Eubanks by a vote of seven to five was not a proper matter to consider as an aggravating circumstance regarding that murder. Although vote counts by which juries have recommended death or life imprisonment have been referred to by this Court in opinions deciding capital sentencing cases, e.g., Walsh v. State, 418 So.2d 1000, 1003 (Fla. 1982); Raulerson v. State, 358 So.2d 826, 831 (Fla.), cert. denied, 439 U.S. 959, 99 S.Ct. 364, 58 L.Ed.2d 352 (1978), the margin by which a jury recommends life imprisonment has no relevance to the question of whether such recommendation should be followed. Even when based on a tie vote, a jury recommendation of life is entitled to great deference. Moreover, we can find no place in the record where the vote tally on the jury's recommended sentence for the murder of Eubanks is shown other than the trial court's findings of fact. Nor does it appear that defense counsel was informed of the fact until he saw it mentioned in the findings of fact issued contemporaneously with the imposition of sentence. However, it is clear that the vote count was only mentioned as a commentary on the course of the proceedings and was not a substantial factor upon which the trial judge relied in deciding to impose the sentence of death. There was no consideration of it as a non-statutory aggravating circumstance. Our review of the record of the sentencing proceeding and the court's findings reveals that the jury's recommendation with regard to the sentence for the murder of Eubanks was given proper consideration. The error, if any, was harmless.
We now come to the multitude of arguments presented by appellant with regard to the other sentencing findings and the sentences of death. He challenges several of the court's findings in aggravation, argues that there were mitigating factors not considered or not assigned proper weight, and questions the appropriateness of the sentences of death under all of the circumstances.
Regarding the murder of John Eubanks, the trial court found the following aggravating circumstances. (1) The murder "was committed for financial gain". See § 921.141(5)(f), Fla. Stat. (1981). (2) The murder was "especially wicked, atrocious or cruel". See Id. § 921.141(5)(h). (3) The murder was "committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification." Id. § 921.141(5)(i). The trial court found one statutory mitigating circumstance: that appellant "had no significant history of prior criminal activity." Id. § 921.141(6)(a). The judge specifically found that all the other mitigating factors in the statute were not shown by the evidence and further found that there was no proof or reasonably convincing showing "that any other aspect of [appellant's] character or record or any other circumstance of the offense is a circumstance to be considered in mitigation of his sentence." In justification of his departure from the jury's sentencing recommendation for the murder of Eubanks, the trial judge found that the circumstances suggesting "that the sentence of death is the only appropriate sentence are so clear and convincing that virtually no reasonable person could differ" and that the facts and circumstances of the murder "admit of no sentence but death."
With regard to the murder of Walton Farmer, the trial court found aggravating *868 circumstances as follows. (1) At the time of his conviction of the murder, appellant "had previously been convicted of another capital offense, to-wit, the premeditated murder of" John Eubanks. See § 921.141(5)(b), Fla. Stat. (1981). (2) The murder was "committed for financial gain." See Id. § 921.141(5)(f). (3) The murder "was especially wicked, atrocious, or cruel." See Id. § 921.141(5)(h). (4) The murder "was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification." Id. § 921.141(5)(i). Regarding each of the five statutory mitigating circumstances argued by the defense, the trial court specifically found that they had not been established and added that there was no proof or reasonably convincing showing "that any other apsects of [defendant's] character or record or any other circumstance of the offense is a circumstance to be considered in mitigation of his sentence."
With regard to both sentences of death, appellant says that the aggravating circumstances found were not supported by the evidence. He argues that the murders were not committed for pecuniary gain, that they were not heinous, atrocious, or cruel, and that they were not committed in a cold, calculated manner. He argues that any special heinousness or cruelty shown by the murder of Eubanks cannot be attributed to him because Schmidt was the actual killer of Eubanks. He argues that his contemporaneous conviction for the murder of Eubanks cannot support the aggravating factor of previous conviction of a violent felony found by the judge in imposing a death sentence for the murder of Farmer.
The aggravating circumstance that the murders were committed for pecuniary gain was established by testimony concerning the cattle-theft scheme and testimony to the effect that appellant believed that with Eubanks out of the way, the unsupervised control of the ranch would be entrusted to appellant, enabling him to convert all its assets to his own use and benefit. When Farmer appeared as a candidate to replace appellant, this scheme required his elimination also.
The finding that the murders were committed in a cold and calculated manner without pretense of moral or legal justification is also applicable. The trial judge found that appellant planned the murders in advance based on a coldly rational, calculated scheme arrived at for reasons of his interest in maintaining and expanding his position of control over the cattle ranch. The finding was supported by evidence. We approve the finding.
We agree, however, with appellant's argument that the murders were not especially heinous, atrocious, or cruel. Although fully premeditated, the murders were carried out quickly by shooting. Based on our interpretation of the statute, we find insufficient support in the evidence for the trial court's finding on this point. Tafero v. State, 403 So.2d 355 (Fla. 1981), cert. denied, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 694 (1982); Lewis v. State, 377 So.2d 640 (Fla. 1979); Kampff v. State, 371 So.2d 1007 (Fla. 1979).
Appellant contends that the trial court erred in considering, as a factor in aggravation of the murder of Farmer, the conviction for the murder of Eubanks. Appellant argues that the statutory aggravating circumstance, "The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person," § 921.141(5)(b), Fla. Stat. (1981), should be construed to refer to convictions obtained previous to the offense for which the defendant is being sentenced. This Court has rejected this argument and held that the aggravating circumstance can be established by contemporaneous and subsequent convictions. Ruffin v. State, 397 So.2d 277 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981); King v. State, 390 So.2d 315 (Fla. 1980), cert. denied, 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 825 (1981); Elledge v. State, 346 So.2d 998 (Fla. 1977).
Appellant contends that the trial court erred in sentencing him to death for the murder of Eubanks when the jury recommended a sentence of life imprisonment for that offense. Appellant relies on Tedder v. State, 322 So.2d 908 (Fla. 1975), which said: *869 "A jury recommendation under our trifurcated death penalty statute should be given great weight. In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Id. at 910. Appellant argues that the jury's recommendation here was reasonable because appellant was not the actual perpetrator of the murder of Eubanks. The trial judge did not fail or refuse to give adequate consideration to the jury's recommendation. He considered the recommendation and specifically found that the Tedder standard was met.
Under the capital felony sentencing law followed in the State of Florida, the recommendation of the jury is not binding but is advisory only. § 921.141(2), Fla. Stat. (1981) ("the jury shall deliberate and render an advisory sentence to the court"). The legislature of the State of Florida acted within its prerogative in establishing that the final sentencing authority would lie with the judge rather than the jury.
In Spaziano v. State, 433 So.2d 508, 511 (Fla. 1983), aff'd, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), this Court held that the facts and circumstances of the crime were such that
the facts suggesting that the death sentence be imposed over the jury's recommendation of life ... meets the clear and convincing test to allow override of the jury's recommendation in accordance with previous decisions of this Court. Tedder v. State, 322 So.2d 908 (Fla. 1975).
We also held that the imposition of a death sentence following a jury's recommendation of life imprisonment was not a violation of double jeopardy protections because under the statute the jury's recommendation is not intended as controlling but only as advisory. On appeal the United States Supreme Court affirmed our judgment holding that there is no constitutional requirement that capital sentencing be performed by a jury; that Florida's statutory provision treating the jury's sentencing verdict as advisory and reposing final sentencing authority with the court is not invalid as allowing cruel or unusual punishment; and that the imposition of a death sentence following a jury recommendation of life did not violate the prohibition against double jeopardy. Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).
By judicial construction, it has been recognized that the Florida capital felony sentencing law contemplates that the recommendation of the jury, though advisory only, should be more than a mere formality. In Lamadline v. State, 303 So.2d 17 (Fla. 1974), we remanded for the empaneling of a special jury to make a sentencing recommendation unless knowingly and intelligently waived by the defendant, who had pleaded guilty of first-degree murder. The Court said: "In some instances it [the advisory opinion of the sentencing jury] could be a critical factor in determining whether or not the death penalty should be imposed." Id. at 20.
In Thompson v. State, 328 So.2d 1 (Fla. 1976), we again ruled on the significance of the jury's recommendation. There the Court said:
This Court is well aware that the recommendation of sentence by the jury is only advisory and is not binding on the trial court. However, the advisory opinion of the jury must be given serious consideration, or there would be no reason for the legislature to have placed such a requirement in the statute. It stands to reason that the trial court must express more concise and particular reasons, based on evidence which cannot be reasonably interpreted to favor mitigation, to overrule a jury's advisory opinion of life imprisonment and enter a sentence of death than to overrule an advisory opinion recommending death and enter a sentence of life imprisonment.
Id. at 5. We applied the Tedder rule to reverse the death sentences imposed by the trial court in McCaskill v. State, 344 So.2d 1276 (Fla. 1977), saying, "Juries are the conscience of our communities." Id. at 1280.
On the other hand, in numerous cases we have affirmed death sentences imposed following jury recommendations of life imprisonment. *870 A few examples are Mills v. State, 476 So.2d 172 (Fla. 1985); Stevens v. State, 419 So.2d 1058 (Fla. 1982), cert. denied, 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983); White v. State, 403 So.2d 331 (Fla. 1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983); Johnson v. State, 393 So.2d 1069 (Fla. 1980), cert. denied, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981); Hoy v. State, 353 So.2d 826 (Fla. 1977), cert. denied, 439 U.S. 920, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); Douglas v. State, 328 So.2d 18 (Fla.), cert. denied, 429 U.S. 871, 97 S.Ct. 185, 50 L.Ed.2d 151 (1976). We have found the Tedder standard was met where "[t]he recommendation of life was not based on any valid mitigating factor discernible from the record." Stevens v. State, 419 So.2d at 1065.
Appellant argues that the degree of participation of state witness Schmidt in the crimes, and the fact that Schmidt received sentences of life imprisonment as compared with appellant's death sentences, were factors in mitigation probably found by the jury and obligating the court to follow the jury's sentencing recommendation. We find this argument to be without merit.
Under Florida law, any person who "aids, abets, counsels, hires, or otherwise procures" an "offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such." § 777.011, Fla. Stat. (1981). Therefore, even though Schmidt did the actual shooting of Eubanks, appellant as an aider and abettor was a principal, guilty of the murder to the same degree as if he had wielded the weapon himself. The fact that Schmidt did the shooting does not in any way detract from the blameworthiness of appellant for this aggravated, premeditated murder.
It is correct to say that the degree of participation and relative culpability of an accomplice or joint perpetrator, together with any disparity of the treatment received by such accomplice as compared with that of the capital offender being sentenced, are proper factors to be taken into consideration in the sentencing decision. In Malloy v. State, 382 So.2d 1190 (Fla. 1979), the death-sentenced appellant had been convicted of committing two murders in concert with other defendants. The Court found that the jury could have believed that although guilty of murder with the others, appellant was not the "triggerman." The other two participants received prison terms of from five to ten years. The Court found these facts to be "a reasonable basis" for the jury's recommendation. The Court concluded:
Because of the jury's recommendation of a life sentence and the fact that there is a reasonable basis for its recommendation, we must agree that to impose the death sentence on the appellant would not be consistent with other sentences imposed in similar circumstances in accordance with the principles laid down by the United States Supreme Court in Proffitt v. Florida, 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913] ... (1976). Our ruling does not mean that the imposition of the death sentence is always dependent upon the sentences of accomplices. It is a factor, however, that may be considered along with evidence of complicity. Each case will depend on its own facts and circumstances. See Witt v. State, 342 So.2d 497 (Fla. 1977).
Id. at 1193 (emphasis in original). Thus the treatment of the accomplice is a factor to be considered, but it is not controlling.
As is indicated above, appellant's legal responsibility for the murder of Eubanks was not secondary to but was fully equal to that of Schmidt. In addition, there was evidence to show that appellant was the planner and the instigator of both murders. If Schmidt had been tried for capital felony in the murder of Eubanks, the evidence would have supported a finding in mitigation that he had acted under the domination of appellant. The fact that appellant was the prime mover with regard to the murder of Eubanks distinguishes this case from Malloy. Thus we conclude that the disparate treatment of Schmidt was not a factor that required the court to *871 follow the jury's recommended sentence for the murder of Eubanks.
Appellant argues that the trial court should have found various other mitigating circumstances. These arguments are without merit.
Appellant contends that the trial court erred in refusing to allow defense counsel to present testimony to the effect that appellant had behaved well during his incarceration from the time of arrest, through the trial, and until the time of sentencing. In Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the Supreme Court reversed a death sentence and remanded for a new sentencing hearing where the state trial court had refused to permit testimony that the defendant had behaved well during the time he spent in jail. The Court found that this exclusion violated the principle, based on Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) and Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), that the defendant must be allowed to present for consideration any relevant mitigating evidence.
The Skipper decision requires reconsideration of the sentences of death imposed in this case. Such reconsideration shall be by the trial judge only because appellant did not attempt to introduce the good-behavior evidence before the jury but only sought to present it to the judge before sentencing.
We affirm both convictions for first-degree murder. We remand the case for reconsideration of the sentences of death.
It is so ordered.
McDONALD, C.J., and OVERTON and EHRLICH, JJ., concur.
SHAW, J., concurs in result only.
ADKINS, J. (Ret.), concurs in the conviction, but dissents from the sentence.
NOTES
[1] The record shows that the court-reporting method used at the trial was audiotape recording. The omission from the record was caused by a mechanical failure. Ideally, proceedings should be reported by means of both tape recording and shorthand reporting. Shorthand notes by themselves are susceptible to mistakes and inaccuracies just as tape recorders are subject to mechanical failure. While using both methods simultaneously would be more likely to produce a failure-proof system, due to limited financial resources most trial courts in Florida choose one method or the other so that a certain amount of failure and inaccuracy is inevitable. See Judicial Coordinating Council, Court Reporting: A Report to the Supreme Court of Florida (1982).
[2] If the state had wanted to contest the holding that appellant's confession was inadmissible, it could have taken a pretrial appeal. § 924.071(1), Fla. Stat. (1981). Moreover, if the state had wanted to establish the admissibility of the confession in case of a new trial, it could have cross-appealed the ruling in connection with this appeal by appellant. § 924.07(4), Fla. Stat. (1981).